# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VERIZON COMMUNICATIONS INC., NYNEX LLC, VERIZON NEW ENGLAND INC., and VERIZON INFORMATION TECHNOLOGIES LLC, | ) ) ) ) ) | |
| | ) | C.A. No. N18C-08-086 EMD CCLD |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, XL SPECIALTY INSURANCE COMPANY, NATIONAL SPECIALITY INSURANCE COMPANY, U.S. SPECIALITY INSURANCE COMPANY, AXIS INSURANCE COMPANY, and ST. PAUL MERCURY INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Submitted: November 16, 2020
Decided: February 23, 2021

*Upon Plaintiffs' Motion for Partial Summary Judgment on Defense Costs*
***GRANTED***

*Upon Defendants' Motion for Judgment on the Pleadings*
***DENIED***

Jennifer C. Wasson, Esquire, Carla M. Jones, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Robin L. Cohen, Esquire, Keith McKenna, Esquire, Cohen Ziffer Frenchman & McKenna LLP, New York, New York, *Attorneys for Plaintiffs Verizon Communications, Inc., NYNEX, LLC, Verizon New England, Inc., and Verizon Technologies, LLC.*

Kurt M. Heyman, Esquire, Aaron M. Nelson, Esquire, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, Lisa C. Solbakken, Esquire, Deana Davidian, Esquire, Arkin Solbakken LLP, New York, New York, *Attorneys for Defendant National Union Fire Insurance Company of Pittsburgh, Pa.*

Bruce E. Jameson, Esquire, John G. Day, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware, Alexis J. Rogoski, Esquire, Tammy Yuen, Esquire, Skarzynski Marick & Black, LLC, New York, New York, *Attorneys for Defendant XL Specialty Insurance Company*.

Robert J. Katzenstein, Esquire, Eve H. Ormerod, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, Michael P. Duffy, Esquire, Scarlett M. Rajbanshi, Esquire, Peabody & Arnold LLP, Boston, Massachusetts, *Attorneys for Defendant National Specialty Insurance Company*.

John C. Phillips, Jr., Esquire, David A. Bilson, Esquire, Phillips, McLaughlin & Hall, P.A., Wilmington, Delaware, Joseph A. Bailey III, Esquire, Gabriela Richeimer, Esquire, Clyde & Co US LLP, Washington, D.C., *Attorneys for Defendant U.S. Specialty Insurance Company*.

Robert J. Katzenstein, Esquire, Eve H. Ormerod, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, Michael R. Goodstein, Esquire, Bailey Cavalieri LLC, Columbus, Ohio, *Attorneys for Defendant AXIS Insurance Company*.

Robert J. Katzenstein, Esquire, Eve H. Ormerod, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, Thomas J. Judge, Esquire, Jason C. Reichlyn, Esquire, Dykema Gossett, PLLC, Washington, D.C., *Attorneys for Defendant St. Paul Mercury Insurance Company*.

**DAVIS, J.**

## I. INTRODUCTION

This insurance coverage dispute case is assigned to the Complex Commercial Litigation Division of this Court. Plaintiffs Verizon Communications Inc. ("Verizon"), NYNEX, LLC, Verizon New England, Inc., and Verizon Technologies, LLC (collectively, the "Insureds") allege Defendants National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"); XL Specialty Insurance Company, National Specialty Insurance Company ("National Specialty"), U.S. Specialty Insurance Company ("US Specialty"), AXIS Insurance Company ("Axis"), and St. Paul Mercury Insurance Company ("St. Paul Mercury") (collectively, the "Insurers"), wrongfully denied them coverage for expenses incurred from a fraudulent transfer lawsuit prosecuted by a bankruptcy trustee (the "*FairPoint* Action"). On August 10, 2018, the Insureds

filed a complaint (the "Complaint"),[1] alleging that the Insurers breached their insurance policies when they failed to honor the indemnification and defense obligations of the policies, and for declaratory relief for indemnification and defense costs.

On September 21, 2018, the Insurers moved to dismiss or, alternatively, to stay this action.[2] On April 26, 2019, the Court denied the motion.[3]

On March 6, 2020, the Insureds moved (the "Insureds Motion") for partial summary judgment on the issue of indemnification and defense costs related to the *FairPoint* Action.[4] On March 9, 2020, the Insurers moved (the "Insurers Motion") for judgment on the pleadings as to coverage relating to the *FairPoint* Action.[5] The parties fully briefed the Insureds Motion and the Insurers Motion. On November 16, 2020, the Court held a hearing on the motions.[6] After hearing from the parties, the Court took the Insureds Motion and the Insurers Motion under advisement.

For the reasons set forth below, the Court will **GRANT** the Insureds Motion and **DENY** the Insurers Motion.

## II. BACKGROUND

### A. THE INSURANCE POLICIES

Two insurance policies (collectively, the "Policies") are relevant to this dispute: (i) a primary policy sold by National Union for the Policy Period of October 31, 2009 to October 31, 2010 (the "Verizon Policy);[7] and (ii) a primary policy sold by National Union for the Policy

---

[1] D.I. 1, Verizon's Complaint ("Compl.").
[2] D.I. 29.
[3] D.I. 62; *see generally Verizon Comms. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2019 WL 2517418 (Del. Super. Ct. Apr. 26, 2019).
[4] D.I. 96.
[5] D.I. 101.
[6] D.I. 130.
[7] Compl. ¶¶ 27-35; D.I. 102, Ex. C (hereinafter, the "Verizon Policy").

Period of March 31, 2008 to March 31, 2014 (the "FairPoint Policy").[8] U.S. Specialty, Axis, and St. Paul Mercury issued the Insureds excess coverage that follows form to the primary Verizon Policy.[9] XL Specialty and National Specialty issued the Insureds excess coverage that follows form to the primary FairPoint Policy.[10] The Policies are virtually identical. The Policies were negotiated, in part, to reduce the Insureds' exposure to liabilities arising from transactions (described below) executed by and between Verizon, FairPoint Communications, Inc. ("FairPoint"), and Northern New England Spinco Inc. ("Spinco").[11]

### 1. Definition of a "Securities Claim."

Central to the Motions is the definition of a "Securities Claim." The Policies define a Securities Claim to include "a Claim," except for administrative or regulatory proceedings maintained against or investigations of an "Organization," "made against any Insured" –

(1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:

(a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or

(b) brought by a security holder of an Organization with respect to such security holder's interest in securities of such Organization; or

(2) brought derivatively on the behalf of an Organization by a security holder of such Organization.[12]

---

[8] *Id.* ¶¶ 18-26; D.I. 102, Ex. A (hereinafter, the "FairPoint Policy").
[9] *Id.* ¶ 34; D.I. 1, Ex. B, Verizon Policy Tower.
[10] *Id.* ¶ 25; D.I. 1, Ex. A, FairPoint Policy Tower.
[11] *Id.* ¶ 21.
[12] FairPoint Policy § 2(y); Verizon Policy § 2(y).

### 2. *Relevant Coverage Definitions.*

The Policies define "Insured" to include an "Organization, but only with respect to a Securities Claim."[13] The Verizon Policy defines "Organization" to include Verizon and its subsidiaries that exist "on or before" the Policy Period.[14] The FairPoint Policy defines "Organization" to include Verizon, FairPoint, and their subsidiaries that exist "on or before" the Policy Period.[15] The Policies define "Loss" to include damages, settlements, judgments and "Defense Costs."[16] And the Policies define "Defense Costs" to include "reasonable and necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment, defense and/or appeal of a Claim against any Insured[.]"[17]

### 3. *Bankruptcy-Related Terms.*

The Policies exclude Loss incurred from a Claim brought inter-Organizationally. The Policies state that the Insurers "shall not be liable . . . for Loss in connection with any Claim made against any Insured: which is brought by or on behalf of an Organization[;]" or "which is brought by any security holder . . . of an Organization, whether directly or derivatively, unless the security holder's . . . Claim is instigated and continued totally independent of . . . any Organization."[18] The Policies also state that this exclusion does not apply "in any bankruptcy proceeding by or against an Organization" or "any Claim brought by the . . . trustee . . . of such Organization."[19]

---

[13] FairPoint Policy § 2(n)(2); Verizon Policy § 2(n)(2).
[14] Verizon Policy §§ 2(t), (z).
[15] FairPoint Policy §§ 2(t), (z) & Endorsement #18 § 1(d)(ii).
[16] FairPoint Policy § 2(p); Verizon Policy § 2(p).
[17] FairPoint Policy § 2(f); Verizon Policy § 2(f).
[18] FairPoint Policy § 4(i); Verizon Policy § 4(i).
[19] FairPoint Policy § 4(i)(3); Verizon Policy § 4(i)(3).

Consistent with the carve-out for bankruptcy, the Policies declare that "[b]ankruptcy or insolvency of any Organization . . . shall not relieve the Insurer[s] of any of [their] obligations" under the Policies.[20]

## B. THE TRANSACTION

On March 31, 2008, Verizon executed a tax-free merger and asset sale using the "reverse Morris trust" technique (the "Transaction").[21] The Transaction involved Verizon, Spinco and FairPoint, and took several steps.[22] Verizon formed Spinco, a wholly-owned subsidiary.[23] Verizon sold Spinco a telecommunications portfolio FairPoint sought to acquire.[24] In exchange, Spinco issued corporate debt notes to Verizon.[25] Verizon divested Spinco by spinning out its stock to Verizon's stockholders.[26] Spinco and FairPoint merged.[27] FairPoint survived.[28] Spinco's stock was cancelled and converted to "new" FairPoint stock.[29] FairPoint's outstanding equity split post-closing comprised a stake for both Verizon-Spinco and pre-merger FairPoint stockholders.[30]

---

[20] FairPoint Policy § 19; Verizon Policy § 19.
[21] Compl. ¶¶ 36-37; D.I. 102, Ex. B, Plaintiff's Second Amended Complaint, *FairPoint Comms., Inc. Litig. Tr. v. Verizon Comms., Inc.*, C.A. No. 3:11-CV-00597-FDW-DCK (W.D.N.C. June 28, 2012), ECF No. 68, ¶¶ 102-13 (hereinafter, "*FairPoint* SAC"); *see Costanzo v. DXC Tech. Co.*, 2020 WL 4284838, at *1 (N.D. Cal. July 27, 2020) (describing the reverse Morris trust); *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 502 (S.D.N.Y. 2019) (same). The transactional structure of a reverse Morris trust resembles a reverse triangular merger, except that the reverse Morris trust is designed to couple an untaxable asset transfer with a spinoff. A reverse triangular merger may involve a spinoff, but its primary function is to consolidate control of two firms indirectly. *Cf. W. Standard, LLC v. Sourcehov Holdings, Inc.*, 2019 WL 3322406, at *6 (Del. Ch. July 24, 2019) (explaining reverse triangular stock-for-stock merger).
[22] *FairPoint* SAC ¶¶ 102-13.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*

FairPoint operated as an independent company.[31]  FairPoint's balance sheet now contained: (i) the assets Spinco had purchased; (ii) joint liabilities FairPoint incurred with Spinco from drawing on a revolving credit facility to capitalize the new company; and (iii) liabilities on Spinco's own notes that it used to finance the initial transfer with Verizon.[32]  Verizon sold those Spinco notes to investment banks.[33]  The investment banks in turn sold the notes to third-party buyers on the secondary market.[34]

The Transaction left FairPoint with considerable debt as it attempted to expand its business in the New England market.  The Transaction also meant that Verizon had eliminated underperforming landlines and paid off its own lenders with the proceeds from FairPoint's debts.

## C. THE *FAIRPOINT* ACTION

FairPoint was unable to service the syndicated debt and the Spinco notes.  On October 26, 2009, FairPoint filed a Chapter 11 petition under the federal Bankruptcy Code.[35]  FairPoint confirmed a plan of reorganization that created a trust with an appointed trustee (the "Trustee") empowered to pursue litigation.[36]  The Trustee was "a successor to [FairPoint] and a representative of [its] estate[.]"[37]  The Trustee was authorized to pursue FairPoint's creditors' causes of action.[38]  Any causes of action were "vested in [FairPoint's] estate."[39]  Those causes of action included Spinco causes of action.[40]

---

[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.* ¶ 11.
[36] *Id.* ¶¶ 1-4, 14-16.
[37] *Id.* ¶ 16.
[38] *Id.* ¶ 4, 142.
[39] *Id.* ¶ 142.
[40] *Id* ¶¶ 4, 142, 154-59.

On October 25, 2011, the Trustee brought an action under federal and state law against Verizon.[41] The Trustee sought to avoid alleged actual and constructive fraudulent transfers connected to the Transaction.[42] The Trustee alleged that FairPoint was insolvent at the time of the Transaction.[43] The Trustee repeatedly delineated the conduct of Spinco, "old" FairPoint, and the post-Transaction FairPoint.[44] The Trustee sought relief from transfers executed between Verizon, Spinco and FairPoint together and separately.[45]

## D. THE PRESENT COVERAGE DISPUTE

As early as October 4, 2010, the Insureds provided notice to the Insurers regarding coverage for a tax dispute between the Insureds and FairPoint's bankruptcy estate.[46] On December 16, 2010, National Union declined coverage.[47] National Union claimed that the tax dispute was not a Securities Claim.[48] Once the *FairPoint* Action was filed, the Insureds provided additional notice to the Insurers regarding coverage.[49] In a January 11, 2012 letter, National Union reiterated its position that the *FairPoint* Action did not state a Securities Claim.[50] The other Insurers adopted National Union's position.[51] Nevertheless, the Insureds continued to update the Insurers on the *FairPoint* Action.[52]

In the early summer of 2014, the Insureds notified the Insurers that the Insureds had settled the *FairPoint* Action.[53] The Insureds settled the *FairPoint* Action for $95 million.[54] The

---

[41] *Id.* ¶¶ 147-59.
[42] *Id.*
[43] *Id.* ¶¶ 150-59.
[44] *Id.*
[45] *Id.* ¶ 163.
[46] Compl. ¶¶ 38-40.
[47] *Id.* ¶ 40.
[48] *Id.*
[49] *Id.* ¶¶ 44-46.
[50] *Id.* ¶ 47.
[51] *Id.* ¶ 48.
[52] *Id.* ¶¶ 49-53.
[53] *Id.* ¶¶ 53-58.
[54] D.I. 97, Krebs Affidavit ¶¶ 6-7; D.I. 99, Stuhr Affidavit ¶ 14.

Insureds also incurred approximately $24 million in defense fees.[55] The Insureds had been sending the Insurers invoices for these amounts during the *FairPoint* Action.[56] The Insurers did not pay any defense costs or otherwise indemnify the Insureds.[57]

On June 11, 2018, the parties engaged in a compulsory mediation.[58] The parties' mediation efforts were unsuccessful.[59] As a result, the Insureds sued the Insurers in this Court.[60] As stated above, the Insureds seek breach of contract damages and declarations that the *FairPoint* Action and its defense fees are covered.[61]

### III. PARTIES' CONTENTIONS

#### A. THE INSUREDS

The Insureds seek coverage under the FairPoint Policy for the settlement in the *FairPoint* Action and its defense costs. The Insureds present several arguments as to why the *FairPoint* Action qualifies as a Securities Claim. First, the Insureds contend that the Trustee was a "security holder" because, under the Bankruptcy Code, the Trustee brought the claims as the debtor's securities holders. Second, the Insureds argue that fraudulent transfer actions are brought "derivatively" (i) as a matter of law and (ii) because the clawed-back value reverts to the debtor's estate for ultimate distribution to creditors. Third, the Insureds claim that the *FairPoint* Action was brought "on the behalf of" FairPoint through its estate because there is no distinction between a debtor and its estate in bankruptcy. The Insureds note that the language of the FairPoint Policy requires this result because the policy's bankruptcy-related provisions would be nullified if a Securities Claim were extinguished any time an Organization filed for bankruptcy.

---

[55] *Id.*
[56] *Id.*
[57] Compl. ¶¶ 53-58.
[58] FairPoint Policy, Alternative Dispute Resolution Endorsement #33 § 17; Verizon Policy § 17.
[59] Compl. ¶¶ 59-61.
[60] *Id.* ¶¶ 63-71 (breach of contract allegations), 72-83 (declaratory judgment allegations).
[61] *Id.*

9

The Insureds also argue that their defense costs are reasonable "Defense Costs" because the costs were incurred in defending the *FairPoint* Action and the Insurers waived any challenge to the Costs' reasonableness by failing to object to the invoices for six years.

## B. THE INSURERS

The Insurers oppose all coverage related to the *FairPoint* Action under the Policies. The Insurers argue that the *FairPoint* Action was not brought "by a security holder" because the Trustee did not own any FairPoint securities. In addition, the Insurers contend that the *FairPoint* Action was brought directly, not derivatively, because fraudulent transfer claims are direct claims as a matter of law. The Insurers alternatively claim that, even if the *FairPoint* Action was brought derivatively, the *FairPoint* Action was brought "on the behalf of" FairPoint's creditors or FairPoint's estate, not FairPoint.

If coverage is found under the FairPoint Policy, the Insurers argue that coverage for the *FairPoint* Action is unavailable under the Verizon Policy because the Verizon Policy does not name FairPoint as an insured and Spinco dissolved as part of the Transaction. The Insurers also contend that the Insured's proffered Defense Costs involve genuine issues of material fact as to their reasonableness and that the Insurers "reserved all their rights" to make this argument at any time.

## IV. STANDARDS OF REVIEW

### A. JUDGMENT ON THE PLEADINGS

A party moves for judgment on the pleadings under Civil Rule 12(c).[62] When considering a Rule 12(c) motion, the Court "is required to view the facts pleaded and the

---

[62] Del. Super. Ct. R. 12(c).

inferences to be drawn from such facts in the light most favorable to the non-moving party."[63] The Court "must take the well-pleaded facts alleged in the complaint as admitted."[64] The Court also must assume "the truthfulness of all well-pled allegations of fact in the complaint."[65] The Court must, therefore, accord the non-movant "the same benefits as a party defending a motion under Rule 12(b)(6)."[66] The Court may grant a Rule 12(c) motion only "when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[67]

## B. SUMMARY JUDGMENT

The Court will grant summary judgment if, after viewing the record in a light most favorable to the non-moving party, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law.[68] In reviewing a summary judgment motion, the Court's task is to detect genuine issues of material fact, not to decide them.[69] If the record reveals that material facts are in dispute, then summary judgment will be denied.[70] Summary judgment also will be denied if the record has not been developed thoroughly enough to allow the Court to apply the law to the record.[71] The moving party bears the initial burden of demonstrating that its claim is supported by undisputed facts.[72] If the motion is properly supported, then the burden shifts to the non-moving party to show that there are material issues of fact to be resolved by a fact-finder.[73]

---

[63] *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL 347015, at *6 (Del. Super. Ct. Feb. 2, 2021) (internal quotation marks omitted).
[64] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1191, 1205 (Del. 1993) (citations omitted).
[65] *Northrop*, 2021 WL 347015, at *6 (internal quotation marks omitted).
[66] *Id.* (internal quotation marks omitted).
[67] *V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at *3 (Del. Super. Ct. July 18, 2019) (citation omitted).
[68] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (citations omitted); *see* Del. Super. Ct. Civ. R. 56.
[69] *Merrill*, 606 A.2d at 99 (citation omitted).
[70] *Northrop*, 2021 WL 347015, at *7 (citing *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413694, at *5 (Del. Super. Ct. Jan. 31, 2019)).
[71] *Ebersole v. Lowengrub*, 180 A.2d 467, 468-69 (Del. 1962).
[72] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[73] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

Although not cross summary judgment motions, the Insureds Motion and the Insurers Motion, in essence, function like cross-dispositive motions. When cross-motions are filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[74] Still, the Court will not grant a cross-dispositive motion unless no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.[75] The Court evaluates each motion separately to determine genuine issues of material fact.[76] And the Court will not grant any judgment as a matter of law if it seems prudent to make a more thorough inquiry into the factual circumstances to which the law must be applied.[77]

## V. DISCUSSION

### A. PLAIN MEANING ANALYSIS GOVERNS INTERPRETATION OF THE POLICIES AND CONSTRUCTION OF THE SECURITIES CLAIM DEFINITION

The Court must decide if the *FairPoint* Action was "brought derivatively on the behalf of an Organization by a security holder of such Organization." To decide whether it was, the Court will turn to general insurance contract principles and specific guidance from the Supreme Court about how to interpret Securities Claims.

#### 1. *General Insurance Contract Principles.*

Insurance policies are contracts.[78] The interpretation of contractual language, including in insurance policies, "is a question of law."[79] The principles governing the interpretation of an

---

[74] Del. Super. Ct. Civ. R. 56(h).

[75] *Northrop*, 2021 WL 347015, at *7 (citations omitted); *see Desert Equities*, 624 A.2d at 1205 n.9 ("[C]ourts generally apply the same standard of review for judgment on the pleadings and summary judgment." (citations omitted)).

[76] *Northrop*, 2021 WL 347015, at *7 (citations omitted).

[77] *Ebersole*, 180 A.2d at 468-69.

[78] *Northrop*, 2021 WL 347015, at *7 (citation omitted).

[79] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001) *see Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018) ("Whether [a] contract's material terms are sufficiently definite [is] mostly, if not

insurance contract are well-settled.  In attempting to resolve a dispute over the proper interpretation of an insurance policy, "a court should first seek to determine the parties' intent from the language of the insurance contract itself."[80]  In reviewing the terms of an insurance policy, the Court considers "the reasonable expectations of the insured at the time of entering into the contract to see if the policy terms are ambiguous or conflicting, contain a hidden trap or pitfall, or if the fine print takes away that which has been provided by the large print."[81] Ambiguity exists when the disputed term "is fairly or reasonably susceptible to more than one meaning."[82]  Absent any ambiguity, contract terms should be accorded their plain, ordinary meaning.[83]  If an insurance policy contains an ambiguous term, then the policy is to be construed in favor of the insured to further the contract's purpose and against the insurer, as the insurer drafts the policy and controls coverage.[84]

When determining an insurer's duty to defend a claim asserted against an insured, the Court will look to the allegations in the underlying complaint to decide whether the action

entirely, a question of law." (citation omitted)); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1232 (Del. 2017) (same).

[80] *Alstrin v. St. Paul Mercury Ins. Co.,* 179 F. Supp. 2d 376, 388 (D. Del. 2002); *see also Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del. 1997)("The scope of an insurance policy's coverage . . . is prescribed by the language of the policy.") (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195–96 (Del. 1992); *Playtex FP, Inc. v. Columbia Cas. Co.,* 622 A.2d 1074, 1076–77 (Del. Super. 1992) (citing *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del. 1985)); *Kaiser Aluminum Corp. v. Matheson,* 681 A.2d 392, 395 (Del. 1996).

[81] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* 1996 WL 111205, at *2 (Del. Super. Jan. 30, 1996)(citation omitted); *see Steigler v. Ins. Co. of N. Am.,* 384 A.2d 398, 401 (Del. 1978) ("[A]n insurance contract should be read to accord with the reasonable expectations of the purchaser so far as the language will permit.")(quoting *State Farm Mut. Auto. Ins. Co. v. Johnson,* 320 A.2d 345, 345 (Del. 1974)(internal quotation marks omitted)).

[82] *Alta Berkeley VIC. V. v. Omneon, Inc.,* 41 A.3d 381, 385 (Del. 2012).

[83] *See id.*; *see also Goggin v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2018 WL 6266195, at *4 (Del. Super. Nov. 30, 2018); *IDT Corp.,* 2019 WL 413692, at *7.

[84] *See Alstrin*, 179 F. Supp. 2d at 390 ("Generally speaking, however, Delaware . . . courts continue to strictly construe ambiguities within insurance contracts against the insurer and in favor of the insured in situations where the insurer drafted the language that is being interpreted regardless of whether the insured is a large sophisticated company.")(citations omitted); *Nat'l Union Fire Ins. Co. v. Rhone–Poulenc Basic Chems. Co.*, 1992 WL 22690, at *8 (Del. Super. Jan. 16, 1992)("Application of the [*contra proferentem*] doctrine turns not on the size or sophistication of the insured, but rather on the fact that the policy language at issue is drafted by the insurer and is not negotiated." (citation omitted)).

against the policy holder states a claim covered by the policy.[85]  Generally, an insurer's duty to

defend is broader than its duty to indemnify an insured.[86]  An insurer has a duty to defend where

the factual allegations in the underlying complaint potentially support a covered claim.[87]  The

insurer will have a duty to indemnify only when the facts in that claim are actually established.[88]

The Court generally will look to two documents in its determination of the insurer's duty

to defend: the insurance policy and the pleadings of the underlying lawsuit.[89]  The duty to defend

arises where the insured can show that the underlying complaint, read as a whole, alleges a risk

potentially within the coverage of the policy.[90]

Where, as here, coverage language is in dispute, the insured bears the burden of

establishing coverage.[91]  When determining whether an underlying claim is covered, the Court

may disregard the underlying claimant's "unilateral characterizations" of its claims.[92]  The Court

instead may look to the underlying complaint as a whole to draw reasonable inferences about the

underlying claim.[93]

---

[85] *Am. Ins. Group v. Risk Enter. Mgmt., Ltd.*, 761 A.2d 826, 829 (Del.2000) ("The rationale underlying this principle is that the determination of whether a party has a duty to defend should be made at the outset of the case, both to provide the insured with a defense at the beginning of the litigation and to permit the insurer, as the defraying entity, to control the defense strategy.").

[86] *Liggett Group, Inc. v. Ace Property and Cas. Ins. Co.*, 798 A.2d 1024, 1030 (Del. 2002)

[87] *DynCorp v. Certain Underwriters at Lloyd's, London*, 2009 WL 3764971, at *3 (Del. Super. Nov. 9, 2009).

[88] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 197 (Del.2009) ("'As a general rule, 'decisions about indemnity should be postponed until the underlying liability has been established'' because a declaration as to the duty to indemnify 'may have no real-world impact if no liability arises in the underlying litigation.'") (quoting *Molex Inc. v. Wyler*, 334 F.Supp.2d 1083, 1087 (N.D.Ill.2004)).

[89] *Virtual Business Enterprises, LLC v. Maryland Cas. Co.*, 2010 WL 1427409, at *4 (Del. Super. Apr. 9, 2010).

[90] *Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist.*, 317 A.2d 101, 103 (Del.1974).

[91] *See Northrop*, 2021 WL 347015, at *18 (citing *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997)).

[92] *Northrop*, 2021 WL 347015, at *11 (citing *IDT Corp.*, 2019 WL 413694, at *10).

[93] *See Blue Hen Mech., Inc. v. Atl. States Ins. Co.*, 2011 WL 1598575, at *2 (Del. Super. Apr. 21, 2011), *aff'd*, 29 A.3d 245 (Del. 2011).

## 2. *Specific Supreme Court Guidance About Securities Claims.*

The Supreme Court recently addressed the Securities Claim definition.[94] The Supreme Court, in *In re Verizon Ins. Coverage Appeals*, rejected Verizon's attempt to obtain coverage for fraudulent transfer claims under a nearly indistinguishable Securities Claim definition to the one at issue here.[95] There, the Supreme Court interpreted the following Securities Claim definition: "a Claim made against any Insured" –

> (1) alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities (including but not limited to the purchase or sale or offer or solicitation of an offer to purchase or sell securities) which is:
>
>> (a) brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale or offer or solicitation of an offer to purchase or sell any securities of an Organization; or
>>
>> (b) brought by a security holder of an Organization with respect to such security holder's interest in securities of such Organization; or
>
> (2) brought derivatively on the behalf of an Organization by a security holder of such Organization, *relating to a Securities Claim as defined in paragraph (1) above*.[96]

The Supreme Court first found that the language in the applicable policy was not ambiguous. Then, applying the unambiguous language of the definition, the Supreme Court held that a bankruptcy trustee's fraudulent transfer claim does not allege a violation of laws or rules regulating securities.[97] The Supreme Court, therefore, seemingly foreclosed Securities Claim coverage for any Claim that does not concern securities regulation as that area is traditionally understood.

---

[94] *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019).
[95] *Id.*
[96] *Id.* at 572-73 (emphasis added).
[97] *Id.* at 572-77.

The FairPoint Policy's Securities Claim definition is critically different. Unlike subparagraph (2) cited above, the FairPoint Policy's "brought derivatively" paragraph does not incorporate subparagraph (1) by reference.[98] The plain unambiguous brought-derivatively paragraph in the FairPoint Policy, therefore, does not contain a regulating-securities element. As a result, the Insureds do not have to establish that the *FairPoint* Action "implicates a regulation, rule or statute specifically directed toward securities law"[99] to have coverage under the FairPoint Policy. That the brought-derivatively paragraph also is separated from the regulating-securities paragraph and subparagraphs by a disjunctive "or" reinforces this conclusion.[100]

Though the Supreme Court's decision does not squarely address the possibility that a Securities Claim definition may not solely reach securities, the decision does provide strong interpretative guidance for construing the definition here. First, the Supreme Court's reasoning suggests that Securities Claim definitions are unambiguous.[101] Second, the Supreme Court instructs that the word "security" should be given the meaning it has in the securities regulation field.[102] Third, federal or analogous state law should supply meaning for any technical but undefined terms, while common usage should supply meaning for generic but undefined terms.[103] And fourth, when the sought-after coverage provision lacks a nexus to securities

---

[98] FairPoint Policy § 2(y)(2).

[99] *In re Verizon Ins. Coverage Appeals*, 222 A.3d at 576 (internal quotation marks omitted); *cf. id.* at 575 ("If a claim arises from a 'purchase or sale' of securities, *or is brought by a securities holder with respect to such interests*," then it must have, under that policy's "Securities Claim definition[,]" "a connection to a securities transaction. . . ." (emphasis added)).

[100] FairPoint Policy § 2(y)(2).

[101] *In re Verizon Ins. Coverage Appeals*, 222 A.3d at 573-75.

[102] *Id.* at 573-74 ("[T]he words used in the definition mirror those in a specific area of the law recognized as securities regulation. . . . Thus, we start with the basic understanding of the words used in the policy that the definition of a Securities Claim is aimed at a particular area of the law, securities law, and not of general application to other areas of law.").

[103] *Id.* at 573 & nn.26-32 (interpreting "offer or sale of securities" and "rules and regulations" primarily in reference to federal law and state "Blue Sky" securities law counterparts); *id.* at 578-79 (analyzing dictionary definitions to derive and confirm plain meaning).

16

regulation, a fraudulent transfer claim need not be "specific to transfers involving securities" to be a Securities Claim.[104]

**B. UNDER THE PLAIN LANGUAGE OF THE FAIRPOINT POLICY, THE *FAIRPOINT* ACTION IS A SECURITIES CLAIM**

*1. A Spinco Note is a "Security."*

The Court must first address whether the *FairPoint* Action involved a "security." The Insureds argue Spinco's notes are "debt securities." Under the Securities Act of 1933, "the term 'security' means any note[.]"[105] Spinco issued "notes" to Verizon that mixed with and impacted FairPoint's debt-equity ratio once the Transaction closed.[106] The federal statutory meaning of "security" thus would indicate that a Spinco note counts as a debt security.

The term "note" in the Securities Act, however, cannot be read too literally. Recognizing that the word "any" would make every loan an unregistered security, the United States Supreme Court limited the definition of the term "note."[107] Our Supreme Court has embraced the same logic and restrictions.[108] Both Courts have held that all notes are presumptively securities,[109] but that the presumption is rebuttable.[110] The presumption is rebuttable in two ways. First, a note is not a security if it falls into a judicially crafted list of instruments often denominated as "notes" but that legally are not considered securities.[111] Spinco's notes do not fit anywhere in that list. Second, if, after engaging a multi-factor test, the note bears a "family resemblance" to one of the

---

[104] *Id.* at 577; *cf. id.* (observing that neither the fraudulent transfer provisions of the Bankruptcy Code nor a state's uniform fraudulent transfer act "are [] specific to securities regulation").

[105] 15 U.S.C. § 77b(a)(1).

[106] *See FairPoint* SAC ¶ 102-13.

[107] *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

[108] *Boo'ze v. State*, 2004 WL 691903 (Del. Mar. 25, 2004).

[109] *Reves*, 494 U.S. at 65; *Boo'ze*, 2004 WL 691903, at *2.

[110] *Id.*

[111] Those categories are: (1) short-term notes secured by a lien on a small business or some of its assets; (2) short-term notes secured by an assignment of accounts receivable; (3) notes evidencing loans by commercial banks for current operations; (4) a note evidencing a "character" loan to a bank customer; and (5) a note that formalizes an open-account debt incurred in the ordinary course of business. *See Reves*, 494 U.S. at 65 (internal quotation marks citations omitted).

instruments on the list, then it is not a security.[112]  The central focus of the "family resemblance" test in the business context is whether the note is an investment or represents a commercial or consumer loan.[113]  If the note is an investment, then it is a security.  If the note represents a commercial or consumer loan, then it is not a security.

The Spinco notes are investments.  They were issued in a primary offering as consideration for a corporate control sale and then resold on the secondary market to institutional buyers.[114]  The holders' likelihood of repayment—or of effective hedging or arbitrage—turned on FairPoint's post-closing success as a new business.[115]  Accordingly, the Court finds the notes are "securities."

### 2.  The Trustee was a "Security Holder" of FairPoint.

The Court must next address whether the *FairPoint* Action was brought "by a security holder" of FairPoint.  The Court reads this phrase as broadly as reason permits.[116]  In addition, the Court reads this phrase and those surrounding it with reference to the United State Bankruptcy Code and Chapter 11 proceedings.[117]

---

[112] These factors include: (1) the counterparties' motivation for transacting; (2) the note's distribution plan; (3) the investing public's reasonable expectations; and (4) the presence of a parallel regulatory scheme that reduces the note's risks in a way sufficient for making application of the securities laws unnecessary.  *See id.* at 64-67 (internal quotation marks and citations omitted); *accord Boo'ze*, 2004 WL 691903, at *2-3.

[113] *See, e.g.*, *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2012 WL 1883040, at *9 (Del. Ch. May 23, 2012) (citing *Reves*, 494 U.S. at 64); *accord Boo'ze*, 2004 WL 691903, at *2-3.

[114] *See Fletcher*, 2012 WL 1883040, at *9 (finding that note presumption will not be rebutted if the note is "easily traded" and looks like "a corporate bond [or] debenture" (citations omitted)); *FairPoint* SAC ¶ 102-13.

[115] *See Fletcher*, 2012 WL 1883040, at *9 (finding that note presumption will not be rebutted if the note "is an instrument the value of which rises and falls with the success of the issuer's business" (citations omitted)).

[116] *See Steigler v. Ins. Co. of North Am.,* 384 A.2d 398, 401 (Del. 1978); *see also Urdan v. WR Cap. Partners, LLC*, 2020 WL 7223313, at *6 n.17 (Del. Dec. 8, 2020) ("Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it." (internal quotation marks omitted)).

[117] *See, e.g.*, *In re Verizon Ins. Coverage Appeals*, 222 A.3d at 573 (invoking federal law to read Securities Claim definition).

When a debtor declares bankruptcy, an estate is created.[118] The estate encompasses "all kinds of property . . . including causes of action."[119] A trustee is appointed to manage the estate's property, including causes of action.[120] As the "representative of the estate," only the trustee has statutory authority to pursue the estate's causes of action.[121] Without court approval, a creditor—like a debt security holder—or the debtor's equity may not bring the estate's claims.[122] Instead, the trustee "stands in the shoes" of the creditor or interest holder to bring claims that the creditor may have had but for the bankruptcy filing.[123]

FairPoint declared bankruptcy. FairPoint got a plan of reorganization confirmed. The Trustee was appointed pursuant to the confirmed plan of reorganization. The Trustee had the exclusive right to prosecute claims that belonged to FairPoint's estate. The Trustee alone brought the *FairPoint* Action because FairPoint's debt security holders were barred from bringing the Action without the Trustee's permission.[124] In other words, the Trustee brought the *FairPoint* Action as a "security holder" of FairPoint because, by operation of law, no security holder could do so. The Court, therefore, finds this part of the Securities Claim definition satisfied.

The Insurers contend the "by a security holder" phrase must be read strictly. According to the Insurers, only a Securities Claim brought by a true security holder qualifies for coverage.

---

[118] *Artesania Hacienda Real S.A. DE C.V. v. North Mill Cap., LLC (In re Wilton Armetale, Inc.)*, 968 F.3d 273, 280 (3d Cir. 2020) (citing 11 U.S.C. § 541).

[119] *Id.* at 280 (citing 11 U.S.C. § 541(a)) (internal quotation marks and citations omitted).

[120] *Id.*

[121] *Id.* (citing 11 U.S.C. §§ 323(a), (b)).

[122] *See In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) ("[C]reditors [cannot] assert claims that are property of the estate." (internal quotation marks omitted)); *see also* 11 U.S.C. §§ 541(a)(1), (3) (defining "property of the estate" to include "all legal and equitable interests of the debtor in property" and value recovered in a fraudulent transfer action).

[123] *See In re Tribune Co.*, 472 B.R. 223, 253 (Bankr. D. Del. 2012), *vacated on other grounds*, 2014 WL 2797042 (D. Del. June 18, 2014), *rev'd on other grounds sub nom.*, *In re Tribune Media Co.*, 799 F.3d 262 (3d Cir. 2015); *accord In re Wilton Armetale, Inc.*, 968 F.3d at 280.

[124] *See In re Wilton Armetale, Inc.*, 968 F.3d at 284-85 (explaining that creditors cannot bring claims belonging to the estate unless the trustee "relinquishes" or "abandons" them).

The Court is not persuaded by this argument on these facts. Coverage language must be read broadly, not strictly.[125] A holder is "a person with legal possession of a document of title or an investment security."[126] But in bankruptcy, FairPoint's debt security holders could not pursue claims related to their notes. Only the Trustee could pursue those claims. The FairPoint Policy clearly contemplated this possibility. Section 19 of the FairPoint Policy states that "[b]ankruptcy or insolvency of any Organization . . . shall not relieve the Insurer[s] of any of [their] obligations[.]" The Insurer's reading would, in fact, relieve them of their obligation to cover Securities Claims if FairPoint goes bankrupt. The Court must harmonize this provision with the Securities Claim definition.[127] The Insurer's reading would make it meaningless and frustrates the Insureds reasonable expectations.[128]

The Insurers also speculate that Spinco debt security holders were not creditors in FairPoint's bankruptcy because Spinco is not explicitly named as a debtor entity in the litigation Trustee's complaint.[129] The Court looks to the complaint as a whole and finds the *FairPoint* Action permits the reasonable inference that Spinco security holders were among FairPoint's creditors.[130] The complaint emphasizes that Spinco's note issuance was integral to Verizon's alleged fraudulent transfers.[131] The complaint also stresses that FairPoint's capital structure was

---

[125] *See, e.g.*, *Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *7 (Del. Super. Sept. 29, 2016.

[126] *Holder*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see In re Verizon Ins. Coverage Appeals*, 222 A.3d at 578-79 (analyzing dictionary definitions in Securities Claim review).

[127] *See Alta Berkeley*, 41 A.3d at 385.

[128] *But see Sonitrol Hld'g Co. v. Marceau*, 607 A.2d 1177, 1183 (Del. 1992)(instructing courts not to render contract terms meaningless); *Med. Depot*, 2016 WL 5539879, at *7 (observing that interpretation should "protect the insured's reasonable expectations" (citations omitted)).

[129] The Court notes that the most logical explanation for this "omission" is that Spinco ceased to exist after the Transaction closed. *See FairPoint* SAC ¶¶ 102-13.

[130] *See Blue Hen*, 2011 WL 1598575, at *2, (observing that courts may look to the underlying complaint as a whole to determine coverage), *aff'd*, 29 A.3d 245; *see also* 11 U.S.C. § 101(10)(A) (defining creditor to include an "entity that has a claim against the debtor that arose at the time of or before" the bankruptcy).

[131] *FairPoint* SAC ¶¶ 102-13, 152-53, 158.

20

adversely affected by those notes.[132]  FairPoint was insolvent and unable to service the notes.[133]

It is therefore conceivable that Spinco security holders would be entitled to some distribution

from FairPoint's estate after the *FairPoint* Action settled.

### 3. The FairPoint Action was "Brought Derivatively."

Now, the Court needs to address the issue of whether the *FairPoint* Action was "brought

derivatively."  This inquiry involves a two-step analysis.  The Court first assesses the claim's

timing.  If the claim attached before the bankruptcy was filed, then it can be derivative.[134]  Here,

the alleged fraudulent transfers occurred during the Transaction.  The Trustee sought to avoid

transfers that happened prior to the filing of the Chapter 11 petition.  The harm, therefore, was

inflicted before the bankruptcy was filed.  Accordingly, the timing element is satisfied.

The second step requires the Court to determine whether the claim is "general to the

estate or personal to the creditor."[135]  Personal claims allege unique, creditor-specific injuries and

therefore are not property of the bankruptcy estate.[136]  In other words, personal claims are direct,

not derivative.[137]  By contrast, general claims "inure[] to the benefit of all creditors by enlarging

the estate[.]"[138]  General claims, then, belong to the estate and are derivative.[139]  When

---

[132] *Id.*

[133] *Id.* ¶ 151.

[134] *In re Wilton Armetale, Inc.*, 968 F.3d at 282 (observing that a trustee may only bring derivative claims, which must "predate[] the bankruptcy"); *see In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (*en banc*) (In bankruptcy, "a 'claim' arises when an individual is exposed . . . [to] conduct giving rise to an injury." (quoting 11 U.S.C. § 101(5))).

[135] *In re Wilton Armetale, Inc.*, 968 F.3d at 282 (citing *In re Emoral*, 740 F.3d at 879).

[136] *Id*; *see In re Emoral*, 740 F.3d at 879 (To be considered "property of the estate, the claim must be a general one, with no particularized injury [to the holder] arising from it." (internal quotation marks omitted)).

[137] *In re Wilton Armetale, Inc.*, 968 F.3d at 283 ("Only when a particular creditor suffers a direct, particularized injury that can be directly traced to the [fraudster] is the claim personal to that creditor and not property of the estate." (internal quotation marks omitted)).

[138] *Id.* at 282 (internal quotation marks and citations omitted); *In re JMO Wind Down, Inc.*, 2018 WL 1792185, at *6 (Bankr. D. Del. Apr. 13, 2018) ("[A] derivative suit . . . is an asset of the corporation—which means that if . . . the corporation is in bankruptcy, the suit is an asset of the bankruptcy estate" and "only may be pursued by the [trustee]." (internal quotation marks and citations omitted)).

[139] *See In re SemCrude, L.P.*, 796 F.3d 310, 316 (3d Cir. 2015); *accord In re Wilton Armetale, Inc.*, 968 F.3d at 282.

distinguishing personal from general claims, the Court focuses on the theory of liability, not the nature of the injury.[140] The theory of liability for general claims is "not tied to the harm done to a [particular] creditor by the debtor."[141] Instead, the theory of liability for general claims is "based on an injury to the debtor's estate that creates a secondary harm to all creditors[.]"[142]

The *FairPoint* Action alleged fraudulent transfers.[143] Fraudulent transfer claims are general because the claims allege "third parties wrongfully depleted the debtor's assets," which means "every creditor has a similar claim for the diversion of assets of the debtor's estate."[144] Any recovery from avoidance actions "reverts back to the estate," *i.e.*, ultimately to "the general creditor body."[145] Because that "recovery would serve to increase the pool of assets available to all creditors," fraudulent transfer claims are derivative as a matter of federal bankruptcy law.[146] Accordingly, the type of claim element is satisfied as well. The "brought derivatively" element in the Securities Claim definition is established.

The Insurers advance several arguments about why the *FairPoint* Action was not "brought derivatively." First, the Insurers insist that the phrase "brought derivatively" was meant to capture only paradigmatic stockholder breach of fiduciary duty actions. The language of the FairPoint Policy does not support such a constraint. The plain language of the definition refers to a "security holder." A stockholder is just one class of security holder, but not the only

---

[140] *In re Wilton Armetale, Inc.*, 968 F.3d at 282.
[141] *Id.* (internal quotation marks omitted).
[142] *Id.* (internal quotation marks omitted).
[143] *See, e.g.*, *FairPoint* SAC ¶¶ 150-60.
[144] *In re Wilton Armetale, Inc.*, 968 F.3d at 282 (cleaned up); *see In re JMO*, 2018 WL 1792185, at *9 (observing that fraudulent transfer claims are "derivative in nature" (internal quotation marks omitted)); *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 328 (Bankr. D. Del. 2005) (same).
[145] *In re JMO*, 2018 WL 1792185, at *7 (citations omitted).
[146] *In re Wilton Armetale, Inc.*, 968 F.3d at 283 (citing *In re Emoral*, 740 F.3d at 881); *see In re JMO*, 2018 WL 1792185, at *7 (observing that courts focus on "who would receive the benefit of the recovery" when distinguishing direct from derivative claims (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004))).

class.  As here, a security holder can be a debt security holder.  The Insureds and the Insurers unambiguously intended coverage for claims brought by any class of security holder.  Otherwise, the parties would have agreed to limit the definition to stock or other equity security holders.

Next, the Insurers suggest that fraudulent transfer claims are direct in bankruptcy.  The Insurers are incorrect.  As explained above, courts have held repeatedly that fraudulent transfer claims are derivative claims when brought in a bankruptcy.

Finally, the Insurers assert that fraudulent transfer claims would be direct outside bankruptcy and the Securities Claim definition cannot transform direct claims into derivative ones simply due to bankruptcy.  Fraudulent transfer claims, however, are not necessarily direct claims outside bankruptcy.  Delaware courts have held that creditors possess derivative standing to bring clawback actions on behalf of a corporation when that corporation is insolvent.[147]

The *FairPoint* Action alleged that FairPoint was insolvent at the time that Verizon's fraudulent transfers were executed.[148]  FairPoint's creditors thus could have brought fraudulent transfer claims derivatively outside bankruptcy.  That aside, the Securities Claim definition is not dependent on whether a Claim is brought outside or inside bankruptcy.  The definition's unambiguous language does not make such distinctions.  If anything, the FairPoint Policy imagined both scenarios.  The FairPoint Policy both disables certain exclusions when an insured files for bankruptcy and totally prevents the Insurers from discriminating against coverage

---

[147] *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 551 (Del. Ch. 2015) ("Delaware law permits creditors of an insolvent corporation to sue derivatively" because, among other reasons, creditors become "equitable owners of the firm's assets" when the firm is unable to pay its debts); *id*. at 561 (observing that fraudulent transfer claims are claims creditors may bring derivatively when the entity is insolvent); *see also N. Am. Cath. Educ. Programming Found v, Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("When a corporation is insolvent…its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.  Consequently, the creditors of an *insolvent* corporation have standing to maintain derivative claims…on behalf of the corporation…(emphasis in original)(citations omitted).

[148] *FairPoint* SAC ¶ 151; *see* 11 U.S.C. § 548(a)(1)(B) (imposing an insolvency requirement on fraudulent transfer actions).

23

merely because an insured filed for bankruptcy.[149]  Accordingly, the Court rejects the Insurers

opposition on this point, which would nullify the bankruptcy carve-outs in the FairPoint

Policy.[150]

### 4.  *The FairPoint Action was Brought "on the Behalf of" FairPoint.*

Finally, the Court must address whether the FairPoint Action was brought "on the behalf

of" FairPoint.  Under federal law, only the bankruptcy trustee or the debtor-in-possession may

bring derivative claims.[151]  That is because derivative claims always are property of the estate.[152]

The trustee is vested with exclusive authority to manage property of the estate, including causes

of action belonging to the debtor and creditors.[153]  As a result, the trustee "represent[s]" the

estate "with the capacity to sue and be sued *on its behalf.*"[154]  The federal construction of the

phrase "on the behalf of" mirrors the phrase's plain meaning, which is "in the name of, on the

part of, as the agent or representative of."[155]

The Court recognizes, therefore, that a trustee does not bring derivative claims "on the

behalf of" creditors.  The trustee's power to sue is derived from the corporate debtor, not its debt

security holders.  The debt security holders' claims are converted into the debtor's estate's

property in bankruptcy.

The Court's finding is supported by the relationship between the debtor's estate and

fraudulent transfer claims.  "Fraudulent conveyance law aims to make available to creditors

---

[149] FairPoint Policy §§ 4(i)(3), 19.
[150] *But see Sonitrol*, 607 A.2d at 1183.
[151] *See In re Wilton Armetale, Inc.*, 968 F.3d at 282-84.
[152] *Id.* at 283.
[153] *Id.* at 281 ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it."); *see also id.* ("A cause of action becomes property of the estate if the claim existed at the commencement of the bankruptcy filing and the debtor could have asserted the claim on his own behalf under state law." (cleaned up)).
[154] *Id.* (citing 11 U.S.C. §§ 323(a), (b)) (emphasis added).
[155] *On behalf of*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see In re Verizon Ins. Coverage Appeals*, 222 A.3d at 578-79.

those assets of the debtor that are rightfully a part of the bankruptcy estate[.]"[156] Consistent with the objective of equitable distribution, value is clawed-back via the trustee "by or on the behalf of the" estate with ultimate benefit to the creditors.[157] That is because fraudulent transfers cause primary injury to the debtor "that creates secondary harm" to its creditors.[158] The "interplay between claims under . . . fraudulent transfer laws and the Bankruptcy Code" conforms to the ordinary distinction between direct and derivative claims when it comes to recovery.[159]

A derivative claim "belongs" to the firm in whose name the investor sues.[160] Any recovery is directed to the firm and might indirectly generate returns for investors.[161] In bankruptcy, the trustee brings claims that "belong" to the estate on its behalf as the estate's property, not the creditors' property.[162] Any recovery is directed to the estate and might indirectly benefit those adequately prioritized or collateralized creditors who are entitled to a share.[163]

The *FairPoint* Action asserted claims regarding "injury" to FairPoint and to claw back value for its estate. The Trustee did so as FairPoint's representative, *i.e.*, "on its behalf." The point of the *FairPoint* Action was to avoid transfers to the Insureds from FairPoint that were

---

[156] *In re Tribune*, 472 B.R. at 253.

[157] *Id.*; *see In re Wilton Armetale, Inc.*, 968 F.3d at 282 (General-derivative claims, *i.e.*, fraudulent transfer claims, "promote[] the orderly distribution of assets in bankruptcy by funneling all asset-recovery . . . through a single plaintiff: the trustee." (internal quotation marks omitted)).

[158] *In re Wilton Armetale, Inc.*, 968 F.3d at 283 (internal quotation marks omitted).

[159] *In re Tribune*, 472 B.R. at 253 (citing *In re PWS Holding Corp.*, 303 F.3d 308, 314 (3d Cir. 2002)).

[160] *See, e.g., In re M & F Worldwide Corp. S'holders Litig.*, 799 A.2d 1164, 1174 & n.31 (Del. Ch. 2002).

[161] *See, e.g., In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1052-55 (Del. Ch. 2015) (explaining the various ways in which derivative recovery may be fixed at the corporate or stockholder level).

[162] *In re Tribune*, 472 B.R. at 253 (observing that the trustee may choose to extinguish claims that might have been the creditors' outside bankruptcy but that became property of the estate once the petition had been filed).

[163] *See id.* at 254 ("Any recoveries [from the fraudulent transfer claims] will be property of the estate pursuant to [11 U.S.C.] § 541(a)(3). . . . [T]he distribution of those funds would be a distribution or payment 'by or on behalf of the Company. . . .'"); *accord In re Wilton Armetale, Inc.*, 968 F.3d at 284 ("[T]he Bankruptcy Code makes a creditor's derivative claims property of the estate. From there, the trustee decides how best to manage them *for the benefit* of all creditors." (emphasis added)); *see also* 11 U.S.C. § 541(a)(3) (providing that clawbacks are property of the estate); 11 U.S.C. § 507 (setting recovery priority levels for creditors based on creditor type and claim type).

replaced with unpayable debt.[164] The injury was to FairPoint primarily. The debt prevented FairPoint from being feasible and paying its obligations as the obligations became due. FairPoint's alleged primary injury harmed its investors secondarily.[165] FairPoint was more likely to default and its investors were less likely to see return. The financial benefits of clawing back those transfers would increase FairPoint's estate's pool of assets for distribution "by or on behalf of" FairPoint's estate to FairPoint's creditors for potential recoupment of some of their losses.[166] Accordingly, the Court finds the "on the behalf of" element satisfied.

The Insurers press alternative readings of and theories about the phrase "on the behalf of." They start by arguing fraudulent transfer claims are brought "on the behalf of" creditors—to whom those claims "belong"—as a matter of law. The Insurers, though, misstate the law. A trustee brings fraudulent transfer claims on the behalf of the estate as its representative, not on the behalf of a debtor's creditors. The plan of reorganization or the Bankruptcy Code's distribution scheme controls distribution and not the creditors.[167] In other words, unabandoned claims belong to the estate, not to the creditors. That some creditors may ultimately reap whatever sums increase the estate's largess does not change this result.

Moreover, the Insurers conflate the phrases "on the behalf of" and "for the benefit of." But the Policy does not say "for the benefit of." The Policy states the clause, "on the behalf of." The Court will not insert language into a plain definition that the Insurers chose to omit.

---

[164] *See* 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer of an interest of the debtor in property, or any obligation . . . incurred by the debtor. . . .").

[165] *In re Wilton Armetale, Inc.*, 968 F.3d at 283-84 (identifying the various ways in which the trustee can dispose claims).

[166] *Id.* at 283; *In re Emoral*, 740 F.3d at 881; *In re JMO*, 2018 WL 1792185, at *7; *In re Tribune*, 472 B.R. at 253-54.

[167] *In re Wilton Armetale, Inc.*, 968 F.3d at 283.

26

The Insurers next urge the Court to abide by inconsistent statements in the *FairPoint* complaint in which the Trustee said it was suing "on the behalf of" creditors.[168] The Court, however, can ignore an underlying claimant's unilateral characterizations of its allegations.[169] Looking to the complaint as a whole, and the federal law it incorporates, the Trustee was suing on behalf of the FairPoint estate under FairPoint's confirmed Chapter 11 plan for recovering litigation assets.[170] As explained, fraudulent transfer claims and their recoveries do not "belong" to the creditors, regardless of the way the trustee stylizes its role.[171]

Finally, the Insurers contend that if the Trustee was suing on the behalf of FairPoint, then it was doing so through its uninsured estate. But there are at least two problems with this argument. First, the debtor does not disappear in a Chapter 11 bankruptcy. The debtor exists temporarily as an estate until it reorganizes and resumes operations. Unless the debtor fully liquidates, there is no practical difference between the debtor and the interests it becomes when the petition is filed.[172] Second, even if there were a difference of commercial magnitude between a debtor and its estate, the Insurers agreed it would not matter. As previously discussed,

---

[168] *See, e.g.*, *FairPoint* SAC ¶¶ 4, 142.

[169] *Northrop*, 2021 WL 347015, at *11 (citing *IDT Corp.*, 2019 WL 413694, at *10).

[170] The Court notes the fact that the Trustee was operating under a trust agreement does not change this outcome. The U.S. Bankruptcy Court for the District of Delaware has accepted that litigation trusts and individual trustees are equivalent when it comes to the Bankruptcy Code provisions addressing property of the estate. *See generally In re Lomas Fin. Corp.*, 1999 WL 33495524 (Bankr. D. Del. June 25, 1999) (requiring defendant to turn over documents to a litigation trust because the documents were property of the estate under §§ 542(a), (e) of the Bankruptcy Code). In addition, the U.S. Court of Appeals for the Third Circuit has treated a bankruptcy litigation trust and trustee as indistinguishable in analyzing derivative claims and the scope of an estate's representation. *See In re SemCrude, L.P.*, 796 F.3d at 312-14, 322. The Trustee also confirmed that the Trustee and the trust were "representatives of FairPoint's estate[.]" *FairPoint* SAC ¶ 142.

[171] *See In re Wilton Armetale, Inc.*, 968 F.3d at 283 ("[W]e decline to rely on the trustee's assertion that [the] claims 'belonged to . . . [the creditor] (not the Wilton estate). . . .' We will not outsource to the trustee our duty to determine what is part of the estate." (citation omitted)).

[172] *See In re Wilton Armetale, Inc.*, 968 F.3d at 284 (observing that a debtor may retain abandoned property of the estate, however gathered, once the debtor obtains a discharge); 11 U.S.C. § 544(c) (same); *cf. In re Edwards*, 2003 WL 22110778, at *2 (Bankr. E.D. Pa. Aug. 28, 2003) (observing a conceptual difference between the debtor and the estate for Bankruptcy Code construction purposes, but not a practical difference as a matter of business reality).

the Insurers assured the Insureds that an insured Organization's bankruptcy would not cancel coverage otherwise provided under the FairPoint Policy.

## C. THE INSURERS FAIL TO SHOW THAT COVERAGE IS UNAVAILABLE UNDER THE VERIZON POLICIES AS A MATTER OF LAW

The Insureds do not seek coverage under the Verizon Policy through the Insureds Motion. The Insurers, however, move separately to oppose coverage for the *FairPoint* Action under the Verizon Policy. The Insurers contend that no coverage is available for any Spinco Securities Claim liabilities because Spinco ceased being a "Subsidiary" over which Verizon had "Management Control" by the time the Verizon Policy was purchased.[173] The Court finds that the Insurers have not carried their burden to show they are entitled to judgment as a matter of law here.

As an initial matter, the Verizon Policy defines "Subsidiary" to include entities over which Verizon has Management Control "*on or before*. . . the Policy Period."[174] Verizon owned 100% of Spinco "before" the Policy Period, *i.e.*, as a special purpose vehicle through March 31, 2008. Spinco liabilities therefore cannot be precluded on this definitional basis.

In addition, the Verizon Policy was amended to include the following endorsement: "'Deal' means the merger of [FairPoint], [and] [Spinco], currently a subsidiary of [Verizon], on March 31, 2008[.]"[175] That same endorsement further provides that coverage is available for "a Claim involving acts, errors or omissions in connection with or relating to the Deal[.]"[176] Plainly, the parties intended this endorsement to expand coverage to liabilities incurred in the

---

[173] Verizon Policy § 2(q) ("Management Control means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of the majority of [managerial staff]; or (2) "having the right to . . . appoint or designate a majority of [managerial staff]." (internal quotation marks omitted)); *id.* § 2(z) ("Subsidiary means: (1) any for-profit entity that is not formed as a partnership over which [Verizon] has Management Control. . . ." (internal quotation marks omitted)).

[174] Verizon Policies § 2(z) (emphasis added) & Endorsement #7.

[175] *Id.* Endorsement #34.

[176] *Id.*

Transaction to a maximum extent.  In fact, this language is much broader than the technical language in the Securities Claim definition and contains none of the latter's restrictions.  The *FairPoint* Action easily alleged "acts"[177] in connection with the Transaction.  For example, the Trustee alleged fraudulent transfers between Verizon and Spinco that led to FairPoint's bankruptcy.[178]  The Trustee also stated that the estate contained some Spinco causes of action.[179]  The *FairPoint Action* permits the reasonable inference that FairPoint was not exclusively liable for Spinco's wrongdoing merely because FairPoint continued to operate as a new business.[180]  If the Court were to adopt the Insurers' interpretation that in no event is there coverage for Securities Claims, then the Deal-specific language and its inclusion is superfluous and/or meaningless.

The Court must harmonize all provisions, not render some illusory.  The Insurers' reading, though, would deny coverage on the Deal-specific basis *and* the Securities Claim basis.  Their reading also would ignore that Spinco was added back into, or recognized as a Subsidiary—and therefore, an Organization[181]—by the Verizon Policy for some purpose.  Though Spinco dissolved as a corporate law matter, its causes of action still may have existed as a bankruptcy law matter because the alleged fraudulent transfers occurred before the merger.[182]  In purchasing the Verizon Policy five days after FairPoint's bankruptcy was filed, Verizon could have reasonably expected that any Spinco-related liabilities would be covered despite Spinco's

---

[177] *Act*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Something done or performed, esp. voluntarily[.]").
[178] *See, e.g.*, *FairPoint* SAC ¶¶ 107, 150-59, 163.
[179] *Id.* ¶¶ 4, 142, 151-53.
[180] *See, e.g.*, *id.* ¶¶ 150-59 (repeatedly separating Spinco's transfers from FairPoint's); *see also Elmer v. Tenneco Resins, Inc.*, 698 F. Supp. 535, 542 (D. Del. 1988) (explaining that, in order to impose successor liability on a merged entity for the dissolved entity's liabilities, the merged entity must be "a continuation of the [dissolved] entity," not simply the "continuation of [a] business operation" of that entity (citations omitted)).
[181] Verizon Policy §§ 2(n), (t), (z).
[182] *FairPoint* SAC ¶¶ 102-13, 151-53, 156-57; *see In re Wash. Mut., Inc.*, 464 B.R. 656, 670 (Bankr. D. Del. 2012) (holding that equity holders of an entity that dissolved in a merger still were entitled to a distribution from assets recovered by the new company's estate on a claim that existed before the merger).

29

divestiture and dissolution. Accordingly, the Insurers have not demonstrated as a matter of law that Spinco's role in the Transaction does not create any Spinco Securities Claim coverage under the Verizon Policy.

Again, the Insureds have not sought Securities Claim coverage under the Verizon Policy for the *FairPoint* Action. There may be none. But the Court finds that these provisions raise genuine and material issues sufficient to deny the Insurers' motion on this point. The parties may resolve issues about Securities Claims and the Verizon Policy at trial. The Court simply must detect issues at this stage, not decide them.

## D. VERIZON IS ENTITLED TO SUMMARY JUDGMENT ON ITS DEFENSE COSTS

The Insureds seek coverage for Defense Costs under the FairPoint Policy. Defense Costs are defined to include "reasonable and necessary" fees incurred from a Claim.[183] After denying coverage and basically ignoring the *FairPoint* Action for six years, the Insurers now complain that the Insureds' fees are unreasonable and unnecessary. In support of this objection, the Insurers offer a belated set of affidavits in which forensic accountants opine that the Insureds' counsel's resources and billing methodologies were inappropriate and excessive.[184] The Insurers also point to their declination letters in which they stated they "reserved all their rights" despite denying coverage entirely.[185] In essence, then, the Insurers ask the Court to audit the Insureds' counsel's billable hours to determine if the fees charged were reasonable and necessary.

"The Court is not required to conduct a line-item review" of fees.[186] Moreover, the Court is not required to "examine individually each time entry and disbursement."[187] The Court is also

[183] FairPoint Policy § 2(f).
[184] D.I. 121, Exs. A-B.
[185] D.I. 99, Exs. H-J.
[186] *Boeing Co. v. Spirit Aerosys, Inc.*, 2017 WL 6021423, at *3 (Del. Super. Dec. 5, 2017).
[187] *Id.* (internal quotation marks omitted).

not required "to conduct an independent inquiry of the appropriateness of counsel's fee for a particular filing or litigation tactic."[188] Where, as here, the litigation's history demonstrates that the Insurers denied coverage, declined to involve themselves with the defense, had possession of the insured's invoices for six years,[189] and only challenged Defense Costs in response to a dispositive motion,[190] the Court declines the invitation to probe counsel's fees.[191] "The [Insurers] had the ability to raise a fairness and reasonableness issue when [they] initially denied coverage based on the Securities Claim definition as well as during the [six-year] period [they] had [Verizon's] Defense Costs invoices[.]"[192] They did not. The Court is not equipped to second-guess the "reasonableness" that the Insurers now untimely bemoan.

The Insurers' best reply is that they "reserved all their rights" in their letters. The Court is unclear as to what "rights" the Insurers intended to reserve when they unequivocally refused to entertain the *FairPoint* Action at all. It certainly was their "right" not to participate. But it also was Insureds' "right" to assume their Defense Costs were reasonable in the face of the Insurers' silence. The Insurers cannot have it both ways. The Court finds the Insurers fail to raise a "*genuine* issue of material fact"[193] regarding the Insureds' Defense Costs. The Court finds the Defense Costs are reasonable as a matter of law. Accordingly, the Insureds' Defense Costs are covered under the FairPoint Policy.

---

[188] *Id.* (citation omitted).
[189] D.I. 99, Exs. I-M.
[190] *Cf. Ethica Corp. Fin. S.r.L. v. Dana Inc.*, 2018 WL 3954205, at *3 (Del. Super. Aug. 16, 2018) ("Courts may disregard or deem waived any arguments made in a reply brief which [were] not raised in the opening brief." (citations omitted)); *see also id.* n.37 (collecting cases).
[191] *See Viking Pump, Inc. v. Century Indem. Co.*, 2013 WL 7098824, at *28-29 (Del. Super. Oct. 31, 2013), *rev'd on other grounds sub nom.*, *In re Viking Pump, Inc.*, 148 A.3d 633 (Del. 2016).
[192] *Id.*, at *9, *see also In re Verizon Ins. Coverage Appeals*, 222 A.3d 566.
[193] Del. Super. Ct. Civ. R. 56(c) (emphasis added).

## VI.  CONCLUSION

For the reasons set forth above, the Court will **GRANT** the Insureds Motion and **DENY**

the Insurers Motion.

Dated: February 23, 2021
Wilmington, Delaware


/s/ Eric M. Davis
Eric M. Davis, Judge

cc: File&ServeXpress